[No. F003612. Fifth Dist. Nov. 8, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES A. JACKSON, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and II.

**COUNSEL**

James William Dirks, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey, Nancy Sweet and David Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MARTIN, J.**—Defendant was convicted of second degree burglary (Pen. Code, § 459)[1] and sentenced to the upper term of three years. He filed a timely notice of appeal.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

### STATEMENT OF FACTS

Habib Raiszadeh, Ph.D., operated a pathology laboratory in Oakdale. On Monday evening, August 8, 1983, Raiszadeh worked at the laboratory until about 10 p.m. He returned the next morning about 8:30 a.m. He found a window broken and the offices and laboratory ransacked. Blood was on the floor, walls and refrigerator. Needles, packages of syringes, reagents, bacteriological equipment, two ice chests, a calculator and a clock radio were missing. One ice chest, the radio and calculator were later recovered.

Richard Martin, an Oakdale policeman involved in the investigation of the lab break-in, found some of the stolen items in a dumpster located about 50 to 60 feet from the defendant's residence and about 300 yards from the lab.

Blood found on the walls and floor of the lab was analyzed. The blood could not have been from samples in the lab as those were in the form of serum and plasma, which is either white or yellow in color. Analysis revealed the blood found on the floor of the lab was of a type possessed by only 10 percent of the general population.

Defendant resided in Oakdale with his daughter, Jennifer Baca. In the early part of August 1983, David Jackson, defendant's son, also resided at Jennifer's home.

On August 9, 1983, another Oakdale policeman detained a vehicle containing the defendant, Jennifer Baca, her husband, son, mother-in-law, and a neighbor. When the car pulled over, the defendant clasped his right hand inside his left hand, jumped from the car and began running in a westerly direction. Jennifer and police officers went to her house. She gave the police permission to search the house and indicated where the police might find the defendant. Detective Larry Parshall conducted the search, finding Dr. Raiszadeh's missing ice chest in a storeroom as well as the calculator and radio. Defendant was captured after jumping the back fence into his brother's yard.

Defendant's sister-in-law, Luellen Jackson, testified defendant came to her house on August 9, 1983, around 7:15 p.m. and asked for a bandage for his cut thumb. She noted his hand was deeply cut around the thumb and knuckle. Defendant told her he cut himself when he fell while carrying some bottles. When police approached the house, defendant ran out the back door.

Testifying on behalf of the defendant, David Jackson admitted to breaking the lab window with a rock or clod of dirt. David claimed he went into the

lab alone and was by himself during the entire burglary. David accounted for the blood spattered about the lab, claiming he spilled or broke some of the vials of blood being tested at the lab. He also claimed responsibility for the items found in the dumpster and in the Baca house. David testified his father's involvement was limited to helping David remove some of the items from the yard per his sister's order. David testified he had already pleaded guilty and had been sentenced for this offense.

On rebuttal, Detective Larry Parshall indicated that during a conversation with David on August 9, 1983, at the Oakdale Police Department, David told him the defendant talked him into participating in the break-in. Additionally, Richard Lynd, Ph.D., a toxicologist, testified the blood at the scene was definitely not David's and was of the same type as that of defendant.

D<span style="font-variant:small-caps">ISCUSSION</span>

I. I<span style="font-variant:small-caps">NEFFECTIVE</span> A<span style="font-variant:small-caps">SSISTANCE OF</span> C<span style="font-variant:small-caps">OUNSEL</span>*

. . . . . . . . . . . . . . . . . . . . . . . .

III. I<span style="font-variant:small-caps">MPEACHMENT</span> W<span style="font-variant:small-caps">ITH</span> P<span style="font-variant:small-caps">RIOR</span> F<span style="font-variant:small-caps">ELONY</span> C<span style="font-variant:small-caps">ONVICTIONS</span>

Defendant finally contends the trial court committed reversible error in ruling he could be impeached with a 1977 conviction of assault with a deadly weapon and a 1971 conviction of robbery.

After the testimony of David Jackson, defense counsel made a motion pursuant to Evidence Code section 352 requesting a determination of whether defendant's prior convictions could be used for impeachment purposes should he choose to testify. The trial court invoked Proposition 8 stating "all felony, prior felony, convictions are admissible. Thus, your request to exclude the felonies is denied." The defendant elected not to testify stating "That's part of the reason, yeah. I feel . . . it would be more harmful to me to get up and testify with . . . those things brought out in front of the jury in this case." Defense counsel, in response to a question by the prosecutor as to whether the defendant was also relying on the state of the evidence in making his election not to testify, stated: "He is, the state of the evidence, burden of proof being on the prosecution, and the fact that Mr. Jackson doesn't feel that his testimony would add anything that any other witness has already testified to. So in that regard he'll not testify."

---

*See footnote, *ante,* page 260.

Additionally, the defendant personally stated for the record he was relying on the state of the evidence in deciding not to testify.

■ Article I, section 28, subdivision (f) of the California Constitution, added by initiative measure effective June 1982, commonly referred to as Proposition 8, provides in pertinent part: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."

In *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], the California Supreme Court interpreted this provision of said section and held: "We shall hold that—always subject to the trial court's discretion under [Evidence Code] section 352—subdivision (f) [of Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*Id.*, at p. 306.)

The *Castro* court further explained: "Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil.' Nevertheless, it is undeniable that a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty. We ourselves recognized this in *People* v. *Rist* [(1976) 16 Cal.3d 211 (177 Cal.Rptr. 457, 545 P.2d 833)] where we said that 'convictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity.' (16 Cal.3d at p. 222.) 'Not as heavily' does not, of course, mean 'not at all.'

"There is then some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to be dishonest than a witness about whom no such thing is known. Certainly the inference is not so irrational that it is beyond the power of the People to decree that in a proper case the jury must be permitted to draw it, if it wishes, and the 'no limitation' language of subdivision (f) makes it abundantly clear that the People so decreed." (*People* v. *Castro, supra,* 38 Cal.3d at p. 315; fns. omitted.)

■ Thus, the initial question is whether the prior felonies necessarily involve moral turpitude.

The *Castro* court equated moral turpitude with a "readiness to do evil." The court stated a crime involves moral turpitude if it "evince[s] any character trait which can reasonably be characterized as 'immoral.'" (*People v. Castro, supra,* 38 Cal.3d at p. 317, fn. 13.)

Thus, *Castro* suggests the conviction of assault with a deadly weapon involves moral turpitude. (*Id.,* at p. 315.) There can be little doubt robbery also involves elements that are pertinent to witnesses' veracity and honesty. All priors which necessarily involve dishonesty under pre-*Castro* standards ipso facto involve moral turpitude under *Castro.* (*People* v. *Parrish* (1985) 170 Cal.App.3d 336, 349 [217 Cal.Rptr. 700].) Furthermore, both of these felonies are crimes of violence which demonstrate "a general readiness to do evil" and are thus morally turpitudinous. (*People* v. *Williams* (1985) 169 Cal.App.3d 951, 957 [215 Cal.Rptr. 612].)

■ As both of defendant's prior convictions here met the requirement of moral turpitude, it is clear, under *Castro,* the trial court erred in failing to then exercise its discretion as to their admissibility in accordance with Evidence Code section 352. By ruling as it did, the trial court denied defendant the benefit of the exercise of its discretion. We must therefore examine the record for prejudice to see if reversal is warranted.

■ Defendant would have this court engage in the weighing process mandated by Evidence Code section 352 and thus decide for the trial court whether defendant's two priors, or either of them, should have been excluded for impeachment purposes. In our view, to do so would constitute appellate error. It is for the trial court to apply the Evidence Code section 352 standard and determine admissibility, or not, stating its reasons and reasoning on the record. This court may then review that record and determine whether an abuse of discretion occurred and, if so, whether such error was harmless.

■ Thus, in the instant case, as in *Castro,* we are limited to a determination of whether the trial court's error, failure to exercise its discretion under Evidence Code section 352, mandates reversal. In reaching this conclusion we apply the test enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], whether it is reasonably probable that a result more favorable to defendant would have occurred in the absence of the error. (*People* v. *Castro, supra,* 38 Cal.3d at p. 319.)

■ His defense was "alibi." His son took the stand and admitted guilt for the burglary and denied that defendant was involved. Defendant's daughter-in-law testified that he was home that evening. The fact this defense was completely undermined when David testified the blood was either

his or from broken laboratory specimens does not help defendant. Expert testimony refuted this statement and established that the blood was of a type compatible with only 10 percent of the population of which defendant was one, but David was not. Due to the overwhelming evidence of defendant's guilt, the alibi defense was of no avail. Defendant's defense was presented to the jury and rejected. He was not prejudiced by his failure to testify and the trial court's error in failing to exercise its discretion regarding the two admitted prior felony convictions was harmless. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) Moreover, while the defendant personally advised the court he elected not to testify for fear of being impeached by the prior convictions, he also personally informed the court that he was relying on the state of the evidence in the case in making his election. Defense counsel further informed the court: "He is, the state of the evidence, burden of proof being on the prosecution, and the fact that Mr. Jackson doesn't feel that his testimony would add anything that any other witness has already testified to. So in that regard he'll not testify." In substance, defendant agreed that his defense had been presented to the jury and his testimony was not necessary.

The judgment is affirmed.

Franson, Acting P. J., and Woolpert, J., concurred.